**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Edelmira Encarnacion, et al.,

        Plaintiffs,

v.

J.B. Hunt Transport Incorporated, et al.,

        Defendants.

No. CV-24-01384-PHX-MTL

**ORDER**

Before the Court are Defendant J.B. Hunt Transport Incorporated's Motion for Partial Summary Judgment (Doc. 71), Motions to Exclude Expert Testimony (Docs. 69, 70), and Motion for Attorneys' Fees (Doc. 79). The motions are fully briefed, and the Court held oral argument on the motions.

## I.    BACKGROUND

On October 27, 2022, a three-vehicle collision occurred on Interstate-10 in Phoenix, Arizona. (Doc. 71-1 at 160-207.) Defendant Eduardo Serrato was operating a tractor trailer when he struck the rear of a Dodge Dart, killing a non-party individual inside the vehicle. (*Id.*) The Dodge Dart was pushed across two lanes, and it impacted the tractor trailer containing Plaintiffs Robert Hanifon and Edelmira Encarnacion. (*Id.*) Mr. Serrato had "nodded off" before the collision, although he had not fallen asleep. (*Id.* at 33.)

Mr. Serrato, a Class-A Commercial Vehicle licensed driver, was employed by Defendant J.B. Hunt, and the tractor trailer he was driving was owned by J.B. Hunt. Prior to J.B. Hunt hiring him on October 19, 2021, Mr. Serrato graduated from a two-week truck

driving education course and received his Commercial Driver's License. (*Id.* at 1; Doc. 80-1 at 5-6, 8.) Mr. Serrato drove commercial trucks as an employee of C.R. England during the eight months leading up to his employment with J.B. Hunt. (Doc. 71-1 at 4.) During his employment with C.R. England, he was involved in two collisions, one of them was deemed "preventable." (*Id.* at 4-5.)

In the process of hiring Mr. Serrato, J.B. Hunt conducted a background check, which included contacting prior employers, drug and alcohol testing, and an analysis of Mr. Serrato's motor vehicle record. (*Id.* at 2-30.) Mr. Serrato was required to possess various credentials, including Entry Level Driver Training and Road-Testing certifications. (*Id.* at 34.) Mr. Serrato was also obligated to complete certain trainings, including driver safety training. (*Id.* at 37.) Mr. Serrato received specific training addressing the dangers of driving while fatigued, but he did not receive any behind-the-wheel training, in-person classroom instruction, or training on compliance with the Federal Motor Carrier Safety Regulations. (*Id.* at 33, 39-152; Doc. 80-1 at 5-6, 9-10.)

In addition to Mr. Serrato's involvement in the collisions prior to his employment with J.B. Hunt, Serrato's employee file notes several incidents that took place leading up to the October 27, 2022, collision. (Doc. 71-1 at 39-152.) Mr. Serrato was involved in an accident and had committed numerous violations. (*Id.*) Mr. Serrato testified that he rarely spoke with his trainer, attended no regular meetings with his trainer, and maintained only minimal contact with his supervisors. (*Id.* at 148; 80-1 at 46-47.)

Plaintiffs filed suit in Arizona Superior Court on May 21, 2024, and J.B. Hunt removed the case to this Court on June 10, 2024. (Doc. 1.) Plaintiffs bring claims against J.B. Hunt, Mr. Serrato, and fictitious defendants for Negligence (Count One), Negligence *Per Se* (Count Two), Respondeat Superior (Count Three), Negligent Hiring, Training & Supervision (Count Four), and Punitive Damages (Count Five). (*Id.* at 10-13.) J.B. Hunt now moves for summary judgment on Plaintiffs' claims for direct negligence and punitive damages. (Doc. 71.) J.B. Hunt also moves to exclude the testimony of Plaintiffs' life care planner experts. (Doc. 69, 70.) Mr. Serrato joined these motions. (Docs. 72-74.) Also

1    pending before the Court is J.B. Hunt's Motion for Attorneys' Fees. (Doc. 79.)

2    **II.    MOTION FOR PARTIAL SUMMARY JUDGMENT**

3        **A.    Legal Standard**

4        Summary judgment is appropriate when the evidence, viewed in the light most

5    favorable to the non-moving party, demonstrates "that there is no genuine dispute as to any

6    material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

7    56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable

8    jury could return a verdict for the nonmoving party," and material facts are those "that

9    might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby,*

10   *Inc.*, 477 U.S. 242, 248 (1986).

11       At the summary judgment stage, the "moving party . . . has both the initial burden

12   of production and the ultimate burden of persuasion on a motion for summary judgment."

13   *Nissan Fire Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

14   But although a movant must demonstrate that there is no genuine issue of material fact, a

15   movant that would not bear the burden of proof at trial does not have to present evidence.

16   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[W]e find no express or implied

17   requirement in Rule 56 that the moving party support its motion with affidavits or other

18   similar materials *negating* the opponent's claim."). "The evidence of the non-movant is to

19   be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citation

20   omitted); *see also Jesinger v. Nev. Fed. Credit Union*, 24 F.3d 1127, 1131 (9th Cir. 1994)

21   (holding that the court determines whether there is a genuine issue for trial but does not

22   weigh the evidence or determine the truth of matters asserted).

23       **B.    Punitive Damages**

24       J.B. Hunt moves the Court to enter summary judgment in Defendants' favor on the

25   issue of punitive damages. (Doc. 71.) Arizona law is applicable to determine whether

26   Plaintiff can recover punitive damages. *Med. Lab Mgmt. Consultants v. ABC*, 306 F.3d

27   806, 812 (9th Cir. 2002) (holding that when a lawsuit is removed to federal district court

28   based on diversity jurisdiction, the court will apply the substantive law of the state in which

it sits). Under Arizona law, "the only means by which a plaintiff is likely to meet the punitive damage standard in a negligence action is by demonstrating that the outrageousness of the defendant's conduct is such that the defendant had an 'evil mind' when engaging in such conduct." *Swift Transp. Co. of Arizona L.L.C. v. Carman in and for Cnty. of Yavapai*, 253 Ariz. 499, 506 (2022). In holding such, the Arizona Supreme Court emphasized that, in the context of a negligence action, "'[t]he focus is on the wrongdoer's attitude *and conduct*.'" *Id.* (citing *Volz v. Coleman Co.*, 155 Ariz. 567, 570 (1987)) (emphasis in original).

"Extreme facts" justify punitive damages. *Bachrach v. Covenant Transp. Inc.*, No. 10-00315-REJ, 2011 WL 1211767, at *2 n.1 (D. Ariz. Mar. 31, 2011). Mere negligence does not suffice. *Monje v. Spin Master Inc.*, 679 Fed. Appx. 535, 537 (9th Cir. 2017). "To be entitled to punitive damages in a negligence action, a plaintiff generally must show that the defendant's conduct was outrageous, oppressive or intolerable, and created a substantial risk of tremendous harm, thereby evidencing a conscious and deliberate disregard of the interests and rights of others." *Id.* (citation modified). "Although it is enough that the defendant had reason to know of the facts creating a substantial risk, it is not enough that a defendant had reason to appreciate the severity of the risk; the defendant must have *actually* appreciated the severity of the risk before *consciously* disregarding it. *Id.* at 507. "A 'substantial risk of harm' is the product of outrageous conduct, which society typically deters by imposing criminal liability," although there is no requirement that an award of punitive damages be justified by criminal liability. *Id.* at 506-07.

Generally, entitlement to punitive damages is proven through circumstantial evidence. *Hawkins v. Allstate Ins.*, 152 Ariz. 490, 498 (1987). "The question of whether punitive damages are justified should be left to the jury if there is any reasonable evidence which will support them." *Farr v. Transamerica Occidental Life Ins.*, 145 Ariz. 1, 9 (App. 1984).

Plaintiff primarily argues that the following evidence supports an award of punitive damages: (1) Serrato knew of the risk of driving fatigued and chose to drive fatigued, (2)

Serrato either falsified his logs or drove in excess of the hours he was permitted to drive, (3) J.B. Hunt fosters a "culture" of "profits over people," and (4) J.B. Hunt fails to train and supervise its drivers. (Doc. 80 at 10-11.) Although the first two theories may be factually supported, they are insufficient by themselves to justify punitive damages. *Bachrach*, 2011 WL 1211767, at *2 ("[Falling] asleep at the wheel, dr[iving] in excess of . . . permitted hours of service, and ha[ving] a poor driving record . . . do[] not approach 'clear and convincing evidence' of an 'evil mind.'"). But punitive damages may be awarded if a plaintiff also shows that a defendant rewarded a driver for dangerous conduct or provided insufficient training and supervision. *McAchran v. Knight Transp., Inc.*, No. 1 CA-CV 08-0091, 2009 WL 888539 (D. Ariz. Apr. 2, 2009) (denying summary judgment as to punitive damages because an inference could be drawn that the defendant failed to provide sufficient staffing to monitor drivers).

Plaintiffs present evidence that the training J.B. Hunt provided Serrato was limited to online videos, quizzes, and standard forms. (Doc. 80 at 3-4.) Serrato testified that close supervision was similarly lacking. (*Id.*) A jury could reasonably conclude that J.B. Hunt appreciated the severity of the risk of driving while fatigued because J.B. Hunt's training materials themselves emphasize that point, including a module titled "Dangers of driving drowsy; how to combat fatigue." (Doc. 71-1 at 154.) A further inference can be drawn that, despite acknowledging the risk, the training materials do so little to address the danger that J.B. Hunt's conduct amounts to a conscious disregard of the risk. Based on Plaintiffs' proffered indicia of insufficient training and supervision, genuine issues of material fact remain as to whether J.B. Hunt acted with an "evil mind" by disregarding a substantial risk to motorist safety. *McAchran*, 2009 WL 888539, at *6.

To be sure, J.B. Hunt did provide training to Serrato regarding the risks of driving while fatigued. (Doc. 71-1 at 154.) J.B. Hunt also required Serrato to sign a "Driver Safety Commitment Card" which states that Serrato would "be rested and alert any time I am behind the wheel" and that he would "make [his] supervisor aware of any safety concerns [he had]." (*Id.* at 56.) J.B. Hunt argues that this forecloses the possibility of punitive

1    damages as a matter of law. But while this evidence is relevant and may ultimately persuade

2    a jury that punitive damages are unwarranted, a reasonable jury could still draw the

3    inference that J.B. Hunt prioritized safety in form rather than substance or otherwise

4    tolerated misconduct through willful blindness. Summary judgment is not appropriate as

5    to punitive damages.

6          While the Court will deny J.B. Hunt's request to grant summary judgment on

7    punitive damages, the Court will grant J.B. Hunt's motion to the extent it argues that

8    Plaintiffs be foreclosed from raising certain theories at trial. *See* Fed. R. Civ. Proc. 56(g)

9    (stating that courts "may enter an order stating any material fact – including an item of

10   damages or other relief – that is not genuinely in dispute and treating the fact as established

11   in the case"). First, the Court finds that Plaintiffs cannot establish that J.B. Hunt fostered

12   an "unsafe work culture." To support their claim for punitive damages, Plaintiffs advance

13   the theory that J.B. Hunt "created an unsafe work culture wherein drivers were encouraged

14   to break the safety rules." (Doc. 80 at 11.) The only supporting evidence advanced is Mr.

15   Serrato's deposition testimony, which states that Mr. Serrato believed he would be fired if

16   he did not drive fatigued. (*Id.* [citing Doc. 80-1 at 38-39].)

17         A culture is a "set of shared attitudes, values, goals, and practices that characterizes

18   an institution or organization." *Culture*, Merriam-Webster,

19   https://www.merriam-webster.com/dictionary/culture (last visited January 7, 2026)

20   (emphasis added). At trial, Plaintiff would have to prove a companywide set of unsafe

21   practices, and the cited testimony falls short of supporting a reasonable inference about

22   widespread values and practices at J.B. Hunt. Mr. Serrato's testimony does not shed light

23   on why felt this way, and Plaintiff does not provide any additional, specific conduct, policy,

24   or institutional practices from which a reasonable jury could inter that J.B. Hunt supported

25   a culture of unsafe practices. Moreover, if testimony states only conclusions, the Court is

26   not weighing the evidence when it discards it. *See U.S. v. Shumway*, 199 F.3d 1093, 1104

27   (9th Cir. 1999) (acknowledging that, for purposes of summary judgment, "if [an] affidavit

28   stated only conclusions, and not such facts as would be admissible in evidence") (citation

modified). The relevant testimony was produced in response to questions about whether he "believe[d]" and "felt" that he would be fired, conclusory statements, not facts. (Doc. 801 at 39); *Ventress v. Smith*, 35 U.S. 161, 171 (1836) ("The belief of a witness is a conclusion from facts. The witness should state facts, and the conclusion to be drawn from them, rests with the jury.") Accordingly, Plaintiff may not proceed at trial on the theory that punitive damages are justified because of an unsafe culture.

Plaintiffs may not proceed under a novel theory that Mr. Serrato falsified his logs or drove in excess of the hours permitted. Plaintiffs must allege all factual and legal bases for claims in the complaint. *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000). If discovery leads to new facts supporting additional theories, a plaintiff must request leave to amend the complaint to pursue the newly discovered claims. *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 969 (9th Cir. 2006). In *Pickern*, the plaintiff's complaint focused on the defendant's refusal to build an accessibility ramp. *Id.* at 968. She attempted to introduce evidence of architectural barriers inside the store for the first time in a response to a motion for summary judgment. *Id.* at 969. The *Pickern* court found that the plaintiff "failed to provide adequate notice of the new allegations." *Id.* Similarly, in Plaintiffs' Response to Motion for Partial Summary Judgment, they raise, for the first time, the theory that Mr. Serrato falsified his logs or drove in excess of permitted hours. Nowhere in the complaint or previous motions do Plaintiffs allege that Serrato falsified his driving log or drove longer than permitted by law. The Court will not permit Plaintiffs to proceed on this theory at trial.

## C. Direct Negligence

J.B. Hunt also moves the Court to grant summary judgment in favor of J.B. Hunt with respect to all of Plaintiffs' direct negligence claims. (Doc. 71 at 8-14.) Those claims include negligent hiring, training, supervision, and entrustment. (*Id.*)

### 1. Absence of Expert Support

First, the Court addresses whether Plaintiffs can sustain their direct negligence claims without expert testimony to establish the standard of care. J.B. Hunt argues that

Plaintiffs' direct negligence claims fail as a matter of law because Plaintiffs have not advanced expert opinions to support them. (Doc. 71 at 13.) Plaintiffs respond that they can rely on federal regulations to establish the standard of care. (Doc. 80 at 15-16.)

When "factual issues are outside the common understanding of jurors," expert testimony is required. *Thomas v. Goudreault*, 163 Ariz. 159, 171 (App. 1989). That means a plaintiff who alleges a specific, specialized duty of care requiring knowledge beyond that known by the ordinary layman must present expert testimony "as to the care and competence prevalent in the business or profession." *St. Joseph's Hosp. & Med. Ctr. v. Reserve Life Ins.*, 154 Ariz. 307, 315 (1987) (citing *Powder Horn Nursery, Inc. v. Soil & Plant Lab., Inc.*, 119 Ariz. 78, 81-82 (App. 1978)). However, expert testimony is not required where "the negligence is so grossly apparent that a layman would have no difficulty in recognizing it." *Riedesser v. Nelson*, 111 Ariz. 542, 544 (App. 1975).

J.B. Hunt's argument rests primarily on an unpublished district court decision from the District of New Mexico, *Ngo v. Slaughter*, No. 2:23-cv-00056-SMD-DLM, 2025 WL 1361734 (D.N.M. May 8, 2025). (Doc. 84 at 11.) Like here, that case involved claims against J.B. Hunt for negligent hiring, training, and supervision of a commercial truck driver. *Ngo*, 2025 WL 1361734. The court found that expert testimony was necessary to sustain the plaintiff's negligent training claim because that "claim would require the jury to consider [the Defendant driver's] experience, what would constitute reasonable training, and whether the training provided was sufficient." *Id.* at *6. J.B. Hunt cites *Ngo* for the proposition that, "[w]ithout the benefit of expert testimony, the jury would be left to speculate as to particularities of commercial truck driver hiring, training, and supervision when analyzing Plaintiffs' direct negligence claims." (Doc. 84 at 11.)

J.B. Hunt overstates *Ngo*'s holding. In addition to the nonbinding nature of the court's decision, the court applied New Mexico, not Arizona, law. Moreover, the District of New Mexico court denied only the negligent training claim, stating that its reasoning did not extend to the other direct negligence claims. *Ngo*, 2025 WL 1361734, at *6 (predicting "that the New Mexico Supreme Court would require expert testimony [to

support] Plaintiff's negligent training claim."). For the reasons stated below, and based on the record before it, the Court finds that *Ngo* is distinguishable, and the Court declines to follow it.

Expert testimony likely would have strengthened Plaintiffs' case, but its absence does not warrant summary judgment on this record. The standards of care under the direct negligence claims may be established by referencing the federal regulations, namely the Federal Motor Carrier Safety Regulations. *Contreras v. Brown*, No. CV-17-08217, 2019 WL 1980837, at *5 (D. Ariz. May 3, 2019) (analyzing, in the absence of any expert testimony, Plaintiffs claims for negligent hiring and training under the framework set out by the FMCSRs); *see also Hagan v. Gemstate Mfg. Inc.*, 939 P.2d 141, 147 (Or. Ct. App. 1997) ("Federal and state regulations are generally subject to judicial notice, whether or not they are binding on a particular party."); 49 C.F.R. §§ 300-399. Moreover, at oral argument, Plaintiffs indicated their intention to use lay testimony from a J.B. Hunt employee to establish the applicable standards of care. At this stage, the Court will not definitively presume that such evidence is insufficient.

Here, Plaintiffs identify the applicable FMCSRs that govern commercial drivers' qualifications and training. (Doc. 80 at 16.) J.B. Hunt responds that lay jurors may not possess the ability to apply certain FMCSRs because they do not provide sufficient detail that would allow a layperson to determine whether a driver's training was sufficient to make the driver "competent." (Doc. 84 at 10.) But competence, when measured by the ability to stay off the road while fatigued, is not necessarily "so esoteric that a lay juror would have difficulty understanding it." *Uiagalelei v. State*, No. 1 CA-CV 19-0274, 2020 WL 5249228, at *3 (Ariz. App. Sept. 3, 2020). Although the commercial trucking industry, in some contexts, involves specialized standards of care, this case does not require the jury to assess the technical sufficiency of a complex training program. *See Ngo*, 2025 WL 1361734, at *6 (finding expert testimony necessary in a case involving the sufficiency of retraining, rather than just training, as implemented on a driver who "held his commercial trucking license for over thirty years and was a seasoned driver, increasing the complexity

of what constitutes 'proper' training."). Although some of the FMCSRs' standards are less detailed, the Court will not bar a jury from applying them, in addition to the standards J.B. Hunt concedes "a layperson would have no issue analyzing (such as the requirements for a driver to be considered qualified to drive a commercial vehicle . . . )." (Doc. 84 at 10.) Plaintiffs' direct negligence claims may move forward notwithstanding the absence of expert support.

### 2. Negligent Hiring

"[F]or a negligent hiring claim to lie, the employer must have known or had some reason to know of the employee's incompetence before hiring the employee." *Hernandez v. Singh*, No. CV-17-08091-PCT-DWL, 2019 WL 367994, at *6 (D. Ariz. Jan. 30, 2019). Arizona follows the Restatement (Second) of Agency § 213, which states that liability is "predicated on the employer's hiring of a person under circumstances antecedently giving the employer reason to believe that the person, by reason of some attribute of character or prior conduct, would create an undue risk of harm to others in carrying out his or her employment responsibilities." Restatement (Second) of Agency § 213, cmt. d (1952); *see also Kassman v. Busfield Enters.*, 131 Ariz. 163 (App. 1981) (noting that Arizona has adopted the Restatement (Second) of Agency § 213).

Before hiring Serrato, J.B. Hunt investigated his background, confirmed that he possessed a Commercial Driver's License, and saw that he had graduated from the C. R. England driving school. (Doc. 71 at 9.) But what matters is what J.B. Hunt "*should* have known." *Hernandez*, 2019 WL 367994, at *6 (emphasis added). Plaintiff demonstrates facts that, arguably, would put a reasonable employer on notice that a candidate was not competent behind the wheel. Serrato had two weeks of training and did not have experience with multi-state drives. (Doc. 80-1 at 6.) Although J.B. Hunt did not uncover these facts, a jury could find that a reasonable pre-employment investigation would have revealed these facts. J.B. Hunt has not demonstrated that, as a matter of law, Plaintiff's negligent hiring claim fails.

### 3.    Negligent Supervision

"[T]o prove negligent supervision, the plaintiff must show the employer knew or should have known the employee was incompetent and that the employer subsequently failed to supervise the employee, ultimately causing the harm at issue." *Hernandez*, 2019 WL 367994, at *7; *see also Vasquez v. City of Phoenix*, No. CV-04-481-PHX-DGC, 2006 WL 1147716, at *4 (D. Ariz. 2006). "The plaintiff must show that the defendant had a reason and opportunity to act, failed to adequately discharge his duty to supervise, and thereby contributed to the cause of the accident." *Krieg v. Schwartz*, No. CV-13-00710-PHX-DLR, 2015 WL 12669893, at *10 (D. Ariz. Aug. 19, 2015) (citation modified).

To show J.B. Hunt knew or should have known of Serrato's incompetence, Plaintiffs point to J.B. Hunt's internal reports that recorded Serrato's incidents, including citations, violations, and collisions. (Doc. 71-1 at 39-152.) J.B. Hunt retorts that none of the incidents involved the operation of a motor vehicle while fatigued. (Doc. 84 at 9.) But the Court will not draw an inference in J.B. Hunt's favor that Serrato's repeated safety incidents are not enough to prompt heightened supervision by virtue of the fact that they do not involve fatigue.

J.B. Hunt argues "Plaintiffs do not . . . explain how additional supervision of Serrato would have prevented the collision from occurring." (Doc. 84 at 9.) That is not true. Plaintiffs argue that increased supervision would have averted the collision by either providing Serrato with additional guidance on the increased risk of driving while fatigued or increasing the probability that J.B. Hunt would have discovered evidence of his incompetence. (Doc. 80 at 13.) Plaintiffs are not required to prove with certainty that additional supervision would have prevented the collision. They must only present evidence from which a reasonable jury could conclude that J.B. Hunt's failure to supervise contributed to the harm. The evidence of repeated safety incidents may permit a reasonable inference that heightened supervision would have reduced the risk that Serrato would continue operating a commercial vehicle while unfit to do so.

### 4. Negligent Training

"To prevail on a negligent training claim, a plaintiff must show a defendant's training or lack thereof was negligent" by presenting "evidence showing what training should have been provided, and that its omission proximately caused the plaintiff's injuries." *Lucero v. STI Trucking Inc.*, No CV-22-08035-PCT-SMB, 2024 WL 4817946, at *5 (D. Ariz. Jan. 4, 2024) (quoting *Guerra v. State*, 234 Ariz. 482, 489 (App. 2014)). "A showing of an employee's incompetence is not necessarily enough; the plaintiff must also present evidence showing what training should have been provided, and that its omission proximately caused the plaintiff's injuries." *Guerra*, 234 Ariz. at 772-73.

J.B. Hunt argues that Plaintiffs' negligent training claim fails as a matter of law, primarily because Serrato acknowledged a written policy warning against driving while fatigued. (Docs. 71 at 11, 71-1 at 51, 84 at 10.) To be sure, Plaintiffs have no basis to support their contention that J.B. Hunt "did NOT provide any information, guidance, or advice regarding what to do when the drivers feel fatigued behind the wheel." (Doc. 80 at 14) (emphasis in original). J.B. Hunt supplied and Serrato signed a form that not only instructed drivers "not to drive while feeling overly . . . fatigued," but also "direct[ed] drivers] to find a safe, legal parking place off the road." (Doc. 71-1 at 51.)

While the Court does not accept Plaintiffs' characterization that J.B. Hunt provided no instruction at all regarding fatigued driving, Plaintiffs' negligent training claim is not foreclosed as a matter of law. The question still remains whether J.B. Hunt should have imposed a more extensive training program on Serrato, and that is a question for the jury. Although Plaintiffs do not specify an exact alternative training regimen that should have been implemented, Rule 56 does not demand such precision. Plaintiffs do point to evidence that J.B. Hunt provided no behind-the-wheel training, no defensive driving training, no training on the FMCSRs Rules, no training on the Arizona CDL manual, and no meetings, trainings, or in-person instructions regarding drowsy driving beyond a single video. (Docs. 80 at 14, 80-1 at 5-6, 9-10.) Viewing these contentions in the light most favorable to Plaintiffs, a reasonable jury could conclude that J.B. Hunt's generalized written

1    admonitions were insufficient and that the absent trainings identified by Plaintiffs "should

2    have been provided." *Guerra*, 237 Ariz. at 772-73.

3                    **5.    Negligent Entrustment**

4        To prevail on a claim of negligent entrustment, a plaintiff must prove:

5        (1) that Defendant owned or controlled a vehicle; (2) Defendant gave the
         driver permission to operate a vehicle; (3) the driver, by virtue of his physical
6        or mental condition, was incompetent to drive safely; (4) the Defendant knew
         or should have known that the driver, by virtue of his physical or mental
7        condition, was incompetent to drive safely; (5) causation; and (6) damages.

8

9    *Hernandez*, 2019 WL 367994, at *6 (internal citation omitted); *see also Verduzco v. Am.*

10   *Valet*, 240 Ariz. 221, 224 (App. 2016) (holding that "Arizona recognizes a cause of action

11   for negligent entrustment as set forth in Restatement (Second) of Torts . . . § 390 (1965)").

12       J.B. Hunt argues that Plaintiffs cannot satisfy two of the elements: (1) "the driver,

13   by virtue of his physical or mental condition, was incompetent to drive safely," and (2)

14   "the Defendant knew or should have known that the driver, by virtue of his physical or

15   mental condition, was incompetent to drive safely." (Doc. 71 at 11-12.) *Hernandez*, 2019

16   WL 367994, at *3 (internal citation omitted). While the "peculiar circumstances of the

17   case" may cause incompetence, courts generally look to indicia of the overall fitness of the

18   individual entrusted with the vehicle to determine whether the defendant should have

19   known of the incompetence. *Hernandez*, 2019 WL 367994, at *3-4 (considering, among

20   other things, the driver's amount of schooling, collision history, and years of training)

21   (citing *Tellez v. Saban*, 188 Ariz. 165, 171 (App. 1996); Restatement (Second) of Torts

22   § 390); *Lucero v. STI Trucking Inc.*, 2024 WL 4817946, at *4 (D. Ariz. Jan. 4, 2024).

23       A reasonable jury could conclude that Serrato was incompetent to drive at the time

24   of the collision. Serrato testified that he knew he was unfit to drive when he arrived at work

25   on the day of the collision. (Doc. 80-1 at 11, 38, 50-51.) Officers performed field sobriety

26   tests on him because he appeared to be intoxicated. (*Id.* at 54-55.) There is also a triable

27   issue of fact as to whether J.B. Hunt knew or should have known of the incompetence. J.B.

28   Hunt maintains that it did not know Serrato was fatigued on that day and that it had no

reason to know, since Serrato had no history of driving while fatigued. (Doc. 84 at 10.) As explained in the discussion concerning negligent supervision, *supra* III.C.3., it is not appropriate for the Court to draw the inference that repeated non-fatigue-related safety incidents were not enough to supply J.B. Hunt with constructive knowledge that Serrato's driving would create a substantial risk. The Court must deny J.B. Hunt's request for summary judgment as to Plaintiffs' claim for negligent entrustment.

In sum, the Court will not grant summary judgment on any of Plaintiffs' claims, but Plaintiffs will be foreclosed from raising certain theories.

## III.    MOTIONS TO EXCLUDE EXPERT TESTIMONY

Plaintiffs intend to have two life care planning experts testify about Plaintiffs' future medical care—Dr. Civiello would testify on Ms. Encarnacion's and Dr. Cherukupally on Mr. Hanifon's. (Docs. 69, 70.) J.B. Hunt moves to strike and exclude portions of the report and proposed testimony of both experts on substantially identical bases. (*Id.*)

### A.    Legal Standard

A trial court must decide, pursuant to Rule 104(a), whether an expert's testimony is admissible. *Daubert v. Merrell Dow Pharm., Inc. (Daubert I)*, 509 U.S. 579, 592 (1993). Federal Rule of Evidence 702 governs the admissibility of expert testimony. *Id.* at 588. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)    the testimony is based on sufficient facts or data;
>
> (c)    the testimony is the product of reliable principles and methods; and
>
> (d)    the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "The inquiry envisioned by Rule 702 is . . . a flexible one." *Daubert I*, 509 U.S. at 594 (holding also that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate

means of attacking shaky but admissible evidence").

The expert testimony must be relevant. *Daubert I*, 509 U.S. at 591 (holding that Rule 702(a) "goes primarily to relevance."). "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2010).

Relevant "scientific . . . knowledge" is admissible, which the United States Supreme Court defines as "an inference or assertion [that] must be derived by the scientific method. *Daubert I*, 509 U.S. at 590. It does not mean "absolute certainty." *Id.* To be admissible, expert testimony must satisfy the following requirements: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert I*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *Id.* at 589.

"[S]omething doesn't become 'scientific knowledge' just because it's uttered by a scientist; nor can an expert's self-serving assertion that [his] conclusions were 'derived by the scientific method' be deemed conclusive . . . ." *Daubert v. Merrell Dow Pharm., Inc. (Daubert II)*, 43 F.3d 1311, 1315-16 (9th Cir. 1995), *cert. denied*, 516 U.S. 869 (1995). An expert "must explain precisely how they went about reaching their conclusions and point to some objective source . . . to show that they have followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in their field." *Id.* at 1319. Although "[t]rained experts commonly extrapolate from existing data . . . nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). The party advancing the expert testimony bears the burden of demonstrating that the testimony is admissible under Rule 702. *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007); *Lust ex rel. Lust v. Merrell Dow*

1    *Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

2        **B.    Dr. Civiello**

3        Plaintiff Edelmira Encarnacion has identified Dr. Caitlin Civiello of the expert

4    witness firm, LCPpro LLC, as the life care planning expert that plans to testify as to her

5    future medical care. (Doc. 70 at 12-53.) Dr. Civiello is an emergency room physician and

6    a certified life care planner. (*Id.* at 2.) She authored a life care plan that purports to identify

7    the care that Ms. Encarnacion will need in the future and the price for that care. (*Id.* at

8    12-39.) J.B. Hunt argues that her opinions are speculative, unreliable, and lack the

9    foundation necessary for admission into evidence. (*Id.* at 1.) J.B. Hunt moves the Court to

10   exclude Dr. Civiello from offering testimony regarding: (1) any future care not

11   recommended by Ms. Encarnacion's medical providers and/or a medical expert, and (2)

12   any opinion premised upon the so-called "LCPPro Cost Median Research Database." *Id.*

13   at 1-2.

14       **1.    Medical Foundation**

15       J.B. Hunt contends that Dr. Civiello's life care plan lacks medical foundation

16   because Dr. Civiello does not have the requisite expertise and did not consider

17   comprehensive enough evidence. (*Id.* at 4-6.) J.B. Hunt suggests that any incongruity

18   between Dr. Civiello's testimony and the recommendations of Ms. Encarnacion's treating

19   physicians or medical specialists. (*Id.* at 1-2.) The Court disagrees.

20       There is no requirement that an expert's opinions agree with the recommendations

21   of a treating physician. That is why it is common to have competing testimony between a

22   treating physician and medical expert. *See Ioane v. Spjute*, No. 1:07-CV-0620-AWI-EPG,

23   2020 WL 2793073, at *5 (E.D. Cal. May 29, 2020) (finding that "[a] medical expert does

24   not need to be a treating physician" and noting that "[n]on-treating physicians regularly

25   qualify as expert witnesses"). Weighing or otherwise interpreting the difference between a

26   treating physician and medical expert's opinions is often a question of weight, not

27   admissibility. *See Walker v. Colvin*, No. ED CV 14-2072-SP, 2016 WL 1118212, at *3

28   (C.D. Cal. Mar. 21, 2016) (finding that "[t]here is no requirement that the treating

physician's opinion must be given the greatest weight"); *see also Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (holding that, "[i]n evaluating proffered expert testimony, the trial court is "a gatekeeper, not a fact finder") (citation and quotation marks omitted).

Regardless, Dr. Civiello's opinions do conform, at least in part, to recommendations made by Ms. Encarnacion's treating providers. Dr. Gilbert Mbeo, one of Ms. Encarnacion's treating provider, recommended neurological treatments, including a stellate ganglion block "to help with her PTSD and anxiety." (Doc. 76-1 at 23.) J.B. Hunt points to the fact that Ms. Encarnacion never followed up on her provider's recommendation or received the injection. (Doc. 70 at 5.) Dr. Civiello testified that Ms. Encarcion's failure to return to her neurologist was not evidence of the absence of medical necessity and instead reflected that she was nervous about receiving another injection. (Doc. 76-1 at 11-12.) To the extent treating physicians did make recommendations that aligned with Dr. Civiello's opinion, J.B. Hunt's challenge collapses into an argument against Dr. Civiello's credibility. It is a question of fact, not admissibility, whether Ms. Encarnacion's failure to return to her provider to receive the injection was evidence of the absence of medical necessity.

To the extent Dr. Civiello's opinions diverge from specific recommendations, the Court concludes that those opinions may nonetheless stand on her independent review of the medical records and literature, and her experience as a licensed physician and certified life care planner. Dr. Civiello purports that her "recommendations of future care are based on 1) provider recommendations and patterns of care, 2) prior experience, and 3) evidence-based literature." (Doc. 70 at 16, 34-36.) Dr. Civiello reviewed a pre-assessment questionnaire completed by Ms. Encarnacion, conducted an assessment, reviewed Ms. Encarnacion's medical records, and consulted with her treating physicians. (*Id.* at 16, 23-28, 33.) Dr. Civiello received her M.D. from the Tufts University School of Medicine and maintains a certification in life care planning and in emergency medicine. (Doc. 70-1 at 13.) She has extensive experience in life care planning and emergency treatment and pain management, including steroid injections and trigger point injections. (Doc. 76-1 at 8-9.) Still, J.B. Hunt argues that her opinions are inadmissible because she does not have

credentials in orthopedics, neurology, and psychology. (Doc. 70 at 45-46.) She also lacks experience providing non-emergency treatment and pain management care. (*Id.*) "Although the fact that a physician may be a board certified specialist may warrant giving greater weight to that physician's opinion on an issue in his or her area of expertise," "there is no requirement that a physician be actively practicing, or practicing in a particular area of, medicine in order to qualify as a medical expert." *May v. Astrue*, No. C09-5591KLS, 2010 WL 3947502, at *9 (W.D. Wash. Oct. 6, 2010). The Court will therefore not exclude Dr. Civiello's testimony by virtue of the fact that she is not a specialist in all areas of care outlined in her report. The jury may weigh her testimony accordingly.

## 2.    The LCPPro Database

In addition to identifying future care, Dr. Civiello also estimated the "usual, customary, and reasonable" ("UCR") cost of that care using the LCPPro Median Cost Research Database. (Doc. 70 at 17.) The LCPpro Database is a:

> Confidential, proprietary, and trade secret database that LCPpro® created utilizing data from more than 2,000 cases. LCPpro®'s Median Cost Research is based on actual provider charges and actual provider estimates for injections and surgeries. LCPpro®'s Median Cost Research utilizes information from the last 24 months to identify the median charge from its extensive database to provide a cost estimate for a particular injection or surgery. LCPpro®'s Median Cost Research proprietary database is update on a quarterly basis (when applicable).

(*Id.* at 19.) The data consists of only medical bills from cases where an LCPpro expert was retained to author a life care plan. (*Id.* at 47.) In other words, the care LCPpro references in the data is care provided almost exclusively to personal injury plaintiffs. (*Id.* at 48.) An LCPpro employee, Shelene Giles, maintains the database. (*Id.* at 50.)

Defendants move to exclude Dr. Civiello's testimony that relies on the database. (Doc. 70.) Defendants point out that numerous courts have excluded expert testimony based on similar data. (*Id.* at 7-9.) The Northern District of Georgia recently found that an LCPpro expert could not offer opinions based on the LCPpro Database because it was confidential, so the jury could not "probe its functioning or accuracy." *Hoyle v. Mitchell*,

No. 1:22-CV-00488-SEG, at *7 (N.D. Ga. June 21, 2024). The District of Wyoming excluded the opinion of an expert based on a "proprietary and confidential" medical billing for the same reason. *Elsasser v. Devon Energy Prod. Co.*, No. 21-CV-0182, 2023 WL 4490401 (D. of Wyo. Feb. 3, 2023). Numerous courts have also excluded medical pricing expert opinions that were based on data from the Fair Health Data Base. *See Belcher v. Kelly*, No. 19-cv-03367-REB-NYW, 2021 WL 62256 (D. Colo. Jan. 6, 2021). In addition to the proprietary nature of the data, these courts take issue with the fact that "the FH database is comprised entirely of sample data purporting to characterize the population of all healthcare charges for the State of Wyoming." *Elsasser*, 2023 WL 4490401, at *9.

The problems identified by those courts are present here too. Like the FH Database, the LCPpro Database is based on a limited sample of data, despite being relied upon for conclusions about a broader population. (Doc. 70 at 47-48); *Elsasser*, 2023 WL 4490401, at *9. Moreover, a jury cannot "probe its functioning or accuracy" because it is proprietary. (Doc. 70 at 50.) This Court similarly finds that Dr. Civiello's expert testimony must be excluded under Rule 702 to the extent that it relies upon the LCPpro Database.

Still, Plaintiffs make it "excruciatingly clear" that the LCPpro Database is not a methodology, but merely facts relied upon. (Doc. 76 at 7.) But even assuming this is true, an admissible expert opinion is based on reliable methodologies *and* sufficient facts. Fed. R. Evid. 502(b), (c). Plaintiffs paint the LCPpro Database as a compilation of preexisting, independent data. The database is maintained by LCPpro personnel, populated exclusively with medical bills drawn from cases in which LCPpro was retained as a litigation expert, and offered by LCPpro experts in support of LCPpro opinions. (Doc. 70 at 47-48, 50.) The database that Plaintiffs portray as a neutral repository of facts exists only because Dr. Civiello's firm selected and compiled those facts, a methodological choice. Plaintiffs cannot sidestep Rule 702 by rebranding the output of their opaque data selection process as "facts." Dr. Civiello's opinions that are based on the LCPpro Database are inadmissible.

## B.     Dr. Cherukupally

Like Dr. Civiello, Dr. Cherukupally is a life care planning expert employed by the

expert witness firm, LCPpro. (Doc. 69 at 1.) Plaintiffs authored a life care plan for Mr. Hanifon, and Plaintiffs plan to offer his testimony on Mr. Hanifon's future medical care needs. (*Id.*)  Defendants move to exclude much of Dr. Cherukupally's testimony. (Doc. 69.) The bases of Defendants' challenge and Plaintiffs' response are substantially similar to those raised with respect to Dr. Civiello.

Defendants argue Dr. Cherukupally's opinion lacks medical foundation because Dr. Cherukupally is not a certified specialist concerning every treatment she includes in her plan. (*Id.* at 4.) They also argue her opinions diverge from the recommendations made by Mr. Hanifon's treating physician. (*Id.* at 4-5.) Again, there is no requirement that an expert's opinions agree with the recommendations of a treating physician. *See supra* III.B.1. As with Dr. Civiello, Dr. Cherukupally possesses experience and qualifications as a physician and life care planner. (Doc. 75 at 6.) Her opinions align, at least in part, with the recommendations of Mr. Hanifon's treating physicians. (Doc. 75-1 at 27, 34-35, 42, 44, 47, 51, 54, 56, 58, 61.) The Court will not exclude Dr. Cherukupally's opinions in their entirety.

The Court, however, will exclude Dr. Cherukupally's opinions based on the LCPpro Database for the same reasons that it is excluding those of Dr. Civiello. *See supra* III.B.2. Unlike Dr. Civiello, Dr. Cherukupally relied on her team to calculate averages and medians of data in the LCPpro Database. (Docs. 69 at 5-6, 75 at 7-8.) Although the parties make much of this fact, it does not alter the Court's analysis.

## IV.    MOTION FOR ATTORNEYS' FEES

On October 3, 2025, after the Court held a show-cause hearing, Plaintiffs were ordered to reimburse J.B. Hunt in the amount of J.B. Hunt's attorneys' fees and expenses incurred related to the cancelled deposition of Dr. Civiello, including preparing for the deposition, the court reporter and videographer, bringing the motion to extend Defendants' deadlines, and preparing and appearing at the hearing regarding the order to show cause. (Doc. 67.) Defendants filed a Motion for Attorneys' Fees, seeking $2,792.00 (Doc. 79). But on January 5, 2026, J.B. Hunt filed a notice apprising the Court that it reached an

agreement with Plaintiffs regarding the sums ought, and no further action is necessary from the Court on the motion. (Doc. 93.) The Court will therefore deny the motion (Doc. 79) as moot.

## V.    CONCLUSION

**IT IS ORDERED** that Defendants' Motion for Partial Summary Judgment (Doc. 71) is **GRANTED IN PART AND DENIED IN PART**. The Court will not grant summary judgment on any of Plaintiffs' claims, but Plaintiffs will be foreclosed from raising the following theories at trial: (1) J.B. Hunt fostered an unsafe work culture, and (2) Mr. Serrato falsified his logs or drove in excess of the hours permitted.

**IT IS FURTHER ORDERED** that Defendants' Motion to Exclude Testimony of Dr. Caitlin Civiello (Doc. 70) is **GRANTED IN PART AND DENIED IN PART**. Dr. Civiello may not offer opinions that are based on the LCPpro Database.

**IT IS FURTHER ORDERED** that Defendants' Motion to Exclude Testimony of Dr. Pallavi Cherukupally (Doc. 69) is **GRANTED IN PART AND DENIED IN PART**. Dr. Cherukupally may not offer opinions that are based on the LCPpro Database.

**IT IS FINALLY ORDERED** that Defendant J.B. Hunt's Motion for Attorneys' Fees and Costs (Doc. 79) is **DENIED** as moot.

Dated this 12th day of January, 2026.

*Michael T. Liburdi*

Michael T. Liburdi
United States District Judge